IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

BRIAN C. DAVISON,

     **Plaintiff**

**v.**                              **Case No.  1:18-CV-1125**

FACEBOOK, INC.; YOUTUBE, LLC.; TWITTER, INC.

AND

LOUDOUN COUNTY SCHOOL BOARD

     **Defendants.**

## FIRST AMENDED COMPLAINT FOR EQUITABLE RELIEF

Brian C. Davison, acting pro se, respectfully states as follows:

## INTRODUCTION

1. As the Supreme Court noted in *Packingham v North Carolina*, social media has become the "modern public square". 137 S. Ct. 1730, 1737 (2017)  Government social media pages have become nearly universal at all levels: local, state and federal.  Such government social media pages are open for two-way communication with constituents, thus constituting various types of public forums.

2. In addition to allowing governments to administer their social media pages, social media site operators also exercise editorial control including deleting comments based on content and viewpoint.  Such behavior in administering a government social media page establishes

1

Defendant social media operators as state actors with respect to the government public forums on their sites.

3. Defendants Facebook, Inc. ("Facebook"), YouTube, LLC ("YouTube"), and Twitter, Inc. ("Twitter") operate some of the world's largest social media sites. Each has deleted content and blocked users on their social media sites when those users' comments were deemed to constitute "hate speech" or violate other viewpoint-based criteria. When blocked, such users are prevented from participating in government social media pages constituting public forums on the respective social media sites.

4. By choosing to create social media pages on the Facebook, YouTube and Twitter platforms, Defendant Loudoun County School Board ("LCSB) knowingly entwined the moderation of user comments on its social media pages with Defendant social media site operators.

5. The threat of being blocked unconstitutionally chills the speech of citizens everywhere on these social media sites, and particularly on government social media pages, else the citizens be banned from future participation in government social media forums.

6. Blocking citizens from participating in government social media pages based on past speech represents an unconstitutional prior restraint.

7. Plaintiff respectfully asks the Court to (i) declare that Defendants' policy of viewpoint-based deletions and blocks on the respective social media sites is unconstitutional and (ii) declare that Defendants' policy allowing such social media blocks represents an impermissible prior restraint. Both unconstitutional actions chill the speech of citizens wishing to participate in limited public forums on Defendant LCSB's social media pages

thereby violating the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

8. This action arises under U.S. Const. Amend. I and XIV and the Plaintiff seeks remedies under 42 U.S.C. § 1983. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (c)(2). A substantial part of the events giving rise to this claim occurred in this District. Defendant LCSB is headquartered in this District. Defendants Facebook, YouTube, and Twitter directly sell advertising to residents of this District. Further, each social media operator Defendant either has a place of business in this District and/or, on information and belief, operates data centers in this District.

## PARTIES

10. Plaintiff, Brian C. Davison, is a resident and citizen of Loudoun County, Virginia. He has taken an interest in the free speech rights of citizens within government-administered public fora.

11. Defendant Facebook, Inc. is the world's largest social media company operating both the Facebook and Instagram social media sites.

12. Alphabet, Inc. is a holding company for a variety of technology subsidiaries including Google, LLC ("Google"). Google is a multinational technology company that specializes

in Internet-related services and products including online advertising, search engines, and social networking. Defendant YouTube, LLC, a subsidiary of Google, runs the world's largest video sharing site.

13. Defendant Twitter, Inc. operates the most popular microblogging social media network in the United States.

14. Defendant LCSB is the governing body responsible for overseeing the public schools within Loudoun County, Virginia. Virginia law establishes each school board as a body corporate which may sue or be sued.

15. LCSB is responsible for the policies of the Loudoun County Public Schools ("LCPS") including policies concerning its social media forums on Facebook, Twitter, and YouTube.

16. Meredith Amonson ("Amonson") lived in Loudoun County, Virginia, for over two (2) decades. Amonson follows local and national public policy discussions, has spoken at local government meetings, and used social media for both personal and public policy reasons.

## FACTS
### Social Media Sites Overview

17. Social media companies provide internet websites where users and organizations can post digital content and engage in communications with other users.

18. In return for providing space on their website, typically free of charge, social media sites gain rights over their users' posted content and sell advertisements. On April 10, 2018,

when questioned how social media sites sustain a business model if they do not charge for their service, Facebook CEO Mark Zuckerberg responded "Senator, we run ads."

19. Social media sites accumulate content from their users and encourage interactions between users in order to attract additional users and increase user engagement with their sites. The sites allow users to create or upload content to their own user profile or social media page in addition to providing commentary on other social media pages within the overall site.

20. Each Defendant social media site generates revenue by selling advertising on its sites to cover the cost of its operations and realize profits. These social media sites leverage user-generated content, including content from government organizations and user discussions on their social media pages, to attract viewers targeted by the advertising.

21. The Defendant social media sites also leverage the vast repository of data they collect on each of its users to allow advertisers to sell ads directly targeting a specific demographic or interest group.

### *Facebook*

22. Facebook's users each maintain one and only one user "profile" which is linked to their real identity. Users may create or upload content on their Facebook profiles.

23. Facebook users may restrict access to the content on their user profile as well as the comments they create elsewhere on Facebook via their user profile.

24. Facebook also allows for the creation of "pages" which represent an organization or a public persona of an individual that is independent of the user's profile. Facebook requires that all "pages" remain public such that all Facebook users may view the contents on these

pages. In addition, even internet users who are not logged in to Facebook may view the contents of Facebook pages.

25. Other Facebook users may create comments directly below the posts on a Facebook page. Each Facebook page is open to comments from other users by default.

26. Each Facebook page has designated Facebook users authorized to administer the page. The administrators may create content posts on the page, delete unwanted comments on the page and block specific Facebook users from commenting on their page in the future.

### *YouTube*

27. YouTube leverages Google's user directory to authenticate and track its users. An individual may maintain more than one user account within Google's directory.

28. YouTube allows its users to upload videos to its social media site.

29. YouTube allows users to create "channels" to organize the video content they upload to the YouTube site.

30. Each uploaded video on YouTube is displayed on its own webpage when another user chooses to watch the video. On that webpage, other Google/YouTube users may create comments directly below the video.

31. The YouTube user who uploads a video may delete unwanted comments on the video's webpage and block specific Google/YouTube users from commenting on their YouTube pages in the future.

### *Twitter*

32. Twitter allows individuals to create multiple accounts, each tied to a separate email address,

within its user directory.

33. A Twitter user generates content via short posts known as "tweets".

34. Twitter limits comments within these tweets to 280 text characters; however, users may upload images, videos, and utilize icons known as emojis to express concepts or emotions in addition to just text.

35. Twitter users may choose to "reply" to a specific tweet from another Twitter user which inextricably associates the reply to the original tweet.

36. Twitter users may also choose to "mention" another specific Twitter account which inextricably associates that tweet to the mentioned Twitter user account.

37. Twitter generates social media pages for each Twitter user showing their tweets and the replies associated to those tweets.

38. Additionally, Twitter users may search the Twitter website for all tweets that "mention" a specific Twitter user account.

39. Twitter users may delete unwanted replies to its tweets and block specific Twitter user accounts from directly viewing or replying to their tweets in the future.


**User Directories**

40. Each Defendant social media site uses a centralized user directory to keep track of user identities and accounts.  Whereas an independent website created specifically for one government entity may have a completely independent set of users, all social media pages created on a Defendant social media site utilize the same centralized user directory to track

and grant permissions to all users and accounts within their ecosystem.

41. Defendants Facebook, YouTube and Twitter do not allow government organizations to create social media pages on their platforms with independent user accounts. If Defendant social media operators ban a user from their social media site, such a user is likewise banned from all government social media pages on the respective social media platform.

42. An organization need not use social media sites to provide two-way communications with constituents. A government organization may stand up their own independent website or online discussion board using their own hardware and licensed software. Government organizations may also lease website space or online discussion boards from service providers in what is known as the internet "cloud".

43. Leased, cloud-based websites and discussion boards may use their own independent user directories; however, such independent user directories would not have access to the vast data repositories that Facebook, Google and Twitter have created on their users.

44. Without access to the vast user data repositories, websites and online discussion boards using independent user directories cannot generate as much revenue via advertising that social media sites achieve via targeted ads. Consequently, leased, cloud-based websites and online discussion boards typically charge fees to government organizations for their services.

45. Independent websites or discussion boards may choose to delegate user identity services to a third-party. Defendants Facebook and Google both provide delegated third-party user identity services to independent websites in addition to providing these services for their own social media sites. If an individual does not maintain a Facebook or Google account,

the individual is unable to utilize Facebook's or Google's delegated user identity service to login to any independent website or discussion board, including those operated for government organizations.

### Social Media Sites Terms of Service and Content Moderation

46. Each Defendant social media site operator publishes its own terms of service that forbids content based on viewpoint.

47. Facebook's terms of service states that its users may not use its services or share content that violates it "Community Standards". Facebook's Community Standards bans hate speech, defined as "a direct attack on people based on what we call protected characteristics — race, ethnicity, national origin, religious affiliation, sexual orientation, caste, sex, gender, gender identity, and serious disease or disability" on its site. Facebook defines an attack as "dehumanizing speech, statements of inferiority, or calls for exclusion or segregation". Exhibit 1 represents an internal Facebook process flow used to determine when content that references a protected class should be deleted. Exhibit 2 represents content that was deleted by Facebook because it referred to certain gender identities as a mental disorder.

48. Among other restrictions, Google and YouTube ban content that "incite[s] hatred against individuals or groups based on certain attributes, such as ... race, religion, gender, ... sexual orientation/gender identity".

49. Among other restrictions, Twitter bans content that "directly attack[s] ... other people on the basis of race, ethnicity, national origin, sexual orientation, gender, gender identity,

religious affiliation". Twitter notes that "non-consensual slurs, epithets, racist and sexual tropes, or other content that degrades someone" would violate its terms of service.

50. It is the policy of each Defendant social media site operator to delete content that violates its terms of service or community standards.

51. It is the policy of each Defendant social media site operator to block or ban, either temporarily or permanently, users who violate its terms of service or community standards multiple times.

52. Defendant social media operators' viewpoint-based content policies operate equally across all social media pages on its sites including pages controlled by government organizations such as Defendant LCSB.

53. Defendant social media site operators exercised their viewpoint-based policies by blocking numerous users throughout their history.

54. On or about October 28, 2017, Twitter permanently suspended Roger Stone's Twitter account. Stone has been described as a long-time President Trump advisor and defended President Trump on social media.

55. On or about August 6, 2018, multiple social media and online website companies banned Alex Jones and his Infowars pages citing their policies against hateful speech. The bans by Apple, Inc.; Spotify; Facebook; and YouTube occurred in rapid succession within a few hours.

56. Approximately one week later, Twitter also imposed a temporary ban on Alex Jones after Twitter was subjected to intense public criticism.

57. The user bans occurred after repeated calls for action by the social media companies to ban hateful speech on their platforms by a wide variety of outside activists.

58. The user bans applied not only to private social media pages on the respective sites but prevented the banned users from commenting on all government social media pages on the sites as well.

59. Facebook's CEO, Mark Zuckerberg, acknowledged there are problems with the current content moderation policies. In a March 30, 2018, interview, Zuckerberg contemplated the creation of an external, quasi-government body to make final judgments on controversial content: "But over the long term, what I'd really like to get to is an independent appeal. So maybe folks at Facebook make the first decision based on the community standards that are outlined, and then people can get a second opinion. You can imagine some sort of structure, almost like a Supreme Court, that is made up of independent folks who don't work for Facebook, who ultimately make the final judgment call on what should be acceptable speech in a community that reflects the social norms and values of people all around the world." (https://www.vox.com/2018/4/2/17185052/mark-zuckerberg-facebook-interview-fake-news-bots-cambridge; last visited on September 4, 2018)

**Social Media Operators Actively Recruit Government Organizations to Utilize their Social Networks for Constituent Communications**

60. Social media companies, including Defendant social media operators, allow organizations to achieve verification badges on their social media pages. The badges or icons ensure viewers that the social media page is the official channel of a brand, business or organization.

61. Twitter invites government organizations to create Twitter accounts including publishing a handbook to "help [the government organization] tap into the power of Twitter to connect with your constituents".

62. Facebook invites government organizations to create Facebook accounts and maintains separate government relations staff to answer questions using the email gov@fb.com. In addition, Facebook maintains separate webpages (https://politics.fb.com/; last visited on September 4, 2018) to guide government actors in utilizing Facebook to connect with constituents.

63. YouTube encourages government organizations to "Use YouTube to strengthen your online presence, control your story and engage your audience wherever they are." (https://www.youtube.com/yt/government101/; last visited on September 4, 2018)

### LCSB's Use of Social Media Pages

64. Defendant LCSB has created social media pages on each of Defendants Facebook, YouTube and Twitter's social media sites.

65. LCPS operates a Facebook page titled "The Official Loudoun County Public Schools" on Facebook.

66. LCPS invites users to create comments under its posts on its Facebook page.

67. LCPS operates multiple Twitter accounts including the "LCPSOfficial" Twitter account that it uses to publish news and events regarding LCPS.

68. LCPS understands that Twitter allows its users to reply to LCPS tweets and "mention"

LCPS Twitter accounts in the users' tweets.

69. LCPS operates YouTube social media pages under the "Loudoun Creates" channel and associated LCPS school channels.

70. LCPS understands that YouTube allows its users to create comments under the videos on the YouTube channels controlled by LCPS

71. By creating the social media pages on Facebook, YouTube and Twitter, LCPS agreed to the terms of service for each social media operator including its viewpoint-based content moderation and banning of users based on past speech within their platforms.

72. Therefore, LCSB is entwined with Defendant social media operators in the management and control of user comments on LCSB's social media pages.

73. By retaining the authority to moderate content on LCSB's social media pages and to ban users from participating in those forums, Defendants Facebook, YouTube and Twitter constitute state actors with respect to the administration of LCSB's social media public forums.


**Willing Speakers Are Chilled by Service Providers' Prohibitions**

74. Amonson has active user accounts on Facebook, Twitter and Google (YouTube).

75. Amonson has had social media comments censored on both local government social media pages and on private social media pages. Specifically, Facebook has deleted some of her comments for attacking protected groups ("white males") deemed a violation of its community standards.

76. Amonson has been blocked on local government social media pages including those administered by Loudoun County officials.

77. While Amonson wishes to continue commenting on government social media pages including those of Loudoun County, she fears that any critical comments about groups will be deleted because of the Defendants policies and that it will result in her being banned from Defendants' platforms altogether.   As a result, Amonson has self-censored her comments on both private and government social media pages. See Exhibit 3.

78. Davison wishes to read comments of willing speakers such as Amonson on government social media pages including comments that are critical and currently violate the community standards of the Defendants.

79. Davison need not maintain user accounts on the Defendants' platforms in order to read the comments of active users such as Amonson.

## COUNT I
## VIOLATION OF FREE SPEECH RIGHTS GUARANTEED BY THE FIRST AND FOURTEENTH AMENDMENTS VIA VIEWPOINT DISCRIMINATION
## DEFENDANTS LCSB, FACEBOOK, YOUTUBE AND TWITTER

80. The allegations of Paragraphs 1-79 are incorporated herein.

81. Defendant LCSB has created social media pages on the Facebook, Twitter and YouTube platforms to share information and communicate with the public.  Defendants encouraged, solicited and allowed public comments and discussions on the social media pages

associated with and administered by Defendant LCSB.

82. The social media pages as established and operated by Defendants constitute full or limited public forums. Citizens' views, comments and opinions expressed thereon are expressions of political speech protected by the First Amendment of the United States Constitution.

83. Defendant LCSB retains the ability to delete user comments or block users from commenting on their social media pages on Facebook, Twitter and YouTube.

84. Defendants Facebook, Twitter and YouTube also retain authority and the ability to moderate content within LCSB's social media pages on their respective platforms.

85. By retaining the authority to exercise administrative control over comments within Defendant LCSB's social media pages and by issuing an explicit policy governing the content on such pages, Defendants Facebook, YouTube and Twitter constitute state actors with respect to LCSB's social media pages on their respective social media sites.

86. Defendants Facebook, Twitter and YouTube's express policy states that it will delete content on the LCSB social media pages based on viewpoint-based criteria.

87. Defendants Facebook, Twitter and YouTube's express policy states that it will ban users from commenting on the LCSB social media pages based on viewpoint-based criteria.

88. Deletion of comments or banning users based on viewpoint discrimination violates the First Amendment of the United States Constitution as applied to the states by the Fourteenth Amendment.

89. The express policy of the Defendants, who serve as government and state actors in

administering LCSB's social media pages, chills the speech of reasonable citizens wishing to participate in the social media public forums established by LCSB.

90. This claim constitutes a facial attack on Defendants' policies governing LCSB's social media pages.

## COUNT II

## VIOLATION OF FREE SPEECH AND DUE PROCESS RIGHTS GUARANTEED BY THE FIRST AND FOURTEENTH AMENDMENTS VIA UNCONSTITUTIONAL PRIOR RESTRAINTS

### DEFENDANTS LCSB, FACEBOOK, YOUTUBE AND TWITTER

91. The allegations of Paragraphs 1-90 are incorporated herein.

92. Defendants Facebook, Twitter and YouTube's express policy states that they will ban users from commenting on the LCSB social media pages based on viewpoint-based criteria and prior speech.

93. Defendants' express policy calls for banning users based on prior speech without providing for protections required by law, namely the initiation of legal proceedings by the government or state actor to obtain injunctions against future speech by the offending user.

94. Such user bans represent unconstitutional prior restraints and violate both free speech and due process rights under the First and Fourteenth Amendments of the United States Constitution.

95. The express policy of the Defendants, who serve as government and state actors in administering LCSB's social media pages, chills the speech of reasonable citizens wishing to participate in the social media public forums established by LCSB.

96. This claim constitutes a facial attack on the policies of Defendants governing LCSB's social media pages.

## COUNT III

## DELETION OF DAVISON'S COMMENTS ON LCSB'S SOCIAL MEDIA PAGES VIOLATES HIS FREE SPEECH RIGHTS (AS APPLIED)

## DEFENDANT FACEBOOK

97. The allegations of Paragraphs 1-96 are incorporated herein.

98. On August 21, 2018, at approximately 9:44am, employees of LCSB created a post on their Facebook social media page that included the Superintendent's back to school message video. https://www.facebook.com/LCPSOfficial/videos/303441356901680. (last visited December 2, 2018)

99. Shortly thereafter, Davison created two (2) comments that were critical of LCSB policies and the resulting standardized test scores.

100. Within one week, the comments had been removed and/or hidden from the LCSB social media page. See Exhibit 4. The first screenshot shows there were three (3) comments created under the post as depicted by the text "3 comments  11 shares 2.1K views". The second screenshot shows that only one of the comments remains visible (sorting by "Oldest" allows that comment to be seen due to a quirk of the Facebook platform). The third screenshot shows that when Davison uses his "Virginia SGP" Facebook page identity, the post only shows one comment remains as depicted by the text "1 comment  11 shares 2.1K views".

101. LCSB officials denied removing or hiding the comments. See Exhibit 5.

102.   On August 27, 2018, employees of LCB created a post on their Facebook social media page titled "Welcome Back To School" that included a video depicting students and teachers returning to Loudoun County Public Schools for the 2018-2019 school year. https://www.facebook.com/LCPSOfficial/posts/2132715743407322                (last          visited December 2, 2018)

103.   Shortly thereafter, Davison created two (2) comments that were critical of LCSB policies and the resulting test scores.  See Exhibit 6.

104.   Within twenty-four (24) hours, one of the comments had been removed and/or hidden from the LCSB social media page.  See Exhibit 7.  The comment that began "And welcome back to Loudoun schools where its project …" is no longer visible.

105.   To this day, the comments remain hidden and/or removed.

106.   In a prior case involving Davison and the Loudoun County Board of Supervisors (1:16-CV-540), Defendant Facebook acknowledged that its systems had deleted protected comments on the "Loudoun County Government" Facebook page on approximately July 19, 2016, without providing notice.  Facebook asserted that its systems had been updated and would no longer delete such content.  Exhibit 8.

107.   In October 2018, after this suit had been initiated, Davison's comments on the Facebook page of a Loudoun County Supervisor were deleted.  Davison was not provided any notice of the deletion but was only made aware when he attempted to edit the comments within minutes of creating them.  Supervisor Letourneau denied deleting the comments. Exhibit 9.  Davison notified Facebook's current counsel of the deletion on the morning of October 23, 2018.

108.   Facebook restored Davison's deleted comments on Supervisor Letourneau's page noted in paragraph 107 within hours of Davison reporting it to Facebook counsel. For the first time since he began using Facebook, Davison received a notification that his comments had been removed and subsequently restored. Davison was not allowed to use Facebook until he acknowledged the notification.   Facebook's current counsel acknowledged the comments were deleted by its systems. Exhibit 9.

109.   Despite the assurances Facebook provided in 2017 noted in paragraph 106 above, Facebook continues to delete comments on government social media pages throughout its systems without any notice to the affected users.

110.   The comments by Davison that were deleted on Facebook's platform are protected speech made on a limited public forum.

111.   The deletion of Davison's comments by Defendant Facebook is prohibited by the First and Fourteenth Amendments and constitutes irreparable harm.

112.   Davison seeks injunctive relief requiring Defendant Facebook to restore the hidden/deleted comments described herein.


## COUNT IV

## DELETION OF DAVISON'S COMMENTS ON LCSB'S SOCIAL MEDIA PAGES WITHOUT ANY NOTICE VIOLATES HIS DUE PROCESS RIGHTS (AS APPLIED)

## DEFENDANT FACEBOOK

113.   The allegations of Paragraphs 1-112 are incorporated herein.

114.   Davison was never independently notified by Facebook or LCSB that any of his

comments identified in paragraphs 98-108 were deleted or even that they might have violated its community standards.

115.   The failure to notify Davison that his speech was censored violates the Due Process protections enshrined in the First and Fourteenth Amendments.

116.   Davison seeks injunctive relief requiring Defendant Facebook to provide adequate due process when removing speech from government social media pages.

## COUNT V

### DEFENDANTS' TERMS OF SERVICE ARE AN UNCONSTITUTIONAL PRIOR RESTRAINT ON A LIMITED PUBLIC FORUM - GOVERNMENT SOCIAL MEDIA PAGES

### DEFENDANTS LCSB, FACEBOOK, YOUTUBE AND TWITTER

117.   The allegations of Paragraphs 1-116 are incorporated herein.

118.   Defendants Facebook, Twitter and YouTube's terms of service ("TOS") require that any user who wishes to comment on their platform's social media pages consent to litigating any disputes in a court based in California.

119.   Defendants Facebook and Twitter expressly relieve any government user of the venue restrictions in their TOS.  Defendant YouTube also relieves any government user of the venue restrictions in their TOS.

120.   The Defendants' TOS chill the speech of willing speakers and threaten enforcement actions against engaged citizens such as Davison and Amonson.

121.   The requirement for users to consent to litigate any constitutional violations by Defendants in a court room thousands of miles away from the local government that

sponsors the page is an unreasonable prior restraint to a limited public forum. Such a restriction is particularly egregious when the same restrictions are not placed upon the local government entities sponsoring the social media pages which serve as limited public forums.

122.   Further, because the venue requirement is not reasonable in light of the purpose of the forum, it is not enforceable for any constitutional claims arising on local government social media pages.

123.   Davison seeks injunctive relief eliminating the California venue requirements from the Defendants' TOS for disputes arising from users' participation in government social media pages.

## RELIEF

WHEREFORE, Plaintiff prays that the Court:

1.   Declare that the Defendant LCSB's social media pages, as described herein, are full or limited public fora;

2.   Declare Defendants' viewpoint-based policies governing user comments on LCSB's social media pages to be unconstitutional;

3.   Declare Defendants' policies governing bans against users on LCSB's social media pages based on prior speech to be unconstitutional;

4.   Declare that the deletion of Davison's comments on LCSB's and other official

Loudoun government social media pages violated his First Amendment rights;

5. Declare that the deletion of Davison's comments on LCSB's and other official Loudoun government social media pages without notice violated his Due Process rights;

6. Declare that Defendants' TOS requiring all disputes be litigated in a California venue to be unconstitutional when the dispute involves government social media pages administered as limited public forums;

7. Provide equitable relief to Plaintiff against Defendant Facebook in Counts III and IV requiring restoration of his deleted comments and adequate due process in the future whenever his comments are removed from a government social media page;

8. Award Plaintiff his costs, including any reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988.

9. Grant any further relief as shall be appropriate.

Dated: January 3, 2019          Respectfully submitted,

ACTING PRO SE                   Brian C Davison
                                43724 Stone Fence Ter
                                Leesburg, VA 20176
                                703.348.7067
                                bcdavison@hotmail.com